IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:09cr246-1 |
| | ) | |
| CALVIN ANTONIO BONNER | ) | |

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

Before the court is the motion of Defendant Calvin Antonio Bonner ("Bonner") for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Bonner made the motion at the close of the Government's evidence at trial and renewed it at the close of all the evidence. The court reserved ruling pursuant to Federal Rule of Criminal Procedure 29(b). Following a two-day trial, the jury convicted Bonner on all charges in the indictment. The parties submitted post-trial briefs (Docs. 35, 36), and the court heard oral argument on June 10, 2010. The matter is now ripe for decision.

I.

A.

Federal Rule of Criminal Procedure 29(a) provides that at the close of the Government's evidence, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a

conviction." Fed. R. Crim. P. 29(a). When the court reserves decision on a Rule 29 motion, as it did in this case, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

"A defendant challenging the sufficiency of the evidence faces a heavy burden." United States v. Foster, 507 F.3d 233, 245 (4th Cir. 2007) (citation omitted), cert. denied, 128 S. Ct. 1690 (2008). The court must view the evidence in the light most favorable to the Government, determining whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. United States v. Collins, 412 F.3d 515, 519 (4th Cir. 2005); Jackson v. Virginia, 443 U.S. 307, 319 (1979). Circumstantial as well as direct evidence must be considered, and a conviction may rely entirely on circumstantial evidence. United States v. Gallimore, 247 F.3d 134, 137 (4th Cir. 2001); United States v. Harvey, 532 F.3d 326, 334 (4th Cir. 2008). Indeed, "circumstantial evidence . . . may be sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis consistent with innocence." United States v. Osborne, 514 F.3d 377, 387 (4th Cir. 2008) (quoting United States v. Jackson, 863 F.2d 1168, 1173 (4th Cir. 1989)). However, the court must be satisfied that there is substantial evidence; that is, when viewed in the light most favorable to the Government, "evidence that a reasonable finder of fact could

2

accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). In assessing the evidence, "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir. 1997) (quoting United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994)).

Bonner was charged with interference with commerce through robbery in violation of 18 U.S.C. § 1951(a) (Count I), and using and carrying, by brandishing, a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count II). In order to prove Count I, the Government must prove the following elements beyond a reasonable doubt: (1) on or about October 29, 2008, Bonner knowingly obtained or took the personal property of another, or from the presence of another, that is property consisting of money belonging to the Subway restaurant at 12201 Highway 150 North, Winston-Salem, North Carolina, from the possession of an employee of that business; (2) Bonner took this property against the victim's will, by actual or threatened force, violence, or fear of injury, whether immediately or in the future; and (3) as a result of Bonner's actions, interstate commerce, or an item moving in interstate commerce, was delayed, obstructed, or

3

affected in any way or degree.  See 18 U.S.C. § 1951(a).  In order to prove Count II, the Government must prove the following elements beyond a reasonable doubt: (1) Bonner knowingly used or carried a firearm; and (2) Bonner did so during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, the crime of interference with commerce by robbery, as charged in Count One.  See 18 U.S.C. § 924(c)(1)(A)(ii).

B.

Viewing the evidence in the light most favorable to the Government, a reasonable jury could have found the following:

On October 29, 2008, just after its 10:00 p.m. closing, the Subway restaurant located at 12201 Highway 150 North, on the Winston-Salem/Davidson County line in North Carolina, was robbed at gunpoint.  One of the employees, D.M., testified that just before the robbery he was in the process of emptying the mop bucket outside the rear of the restaurant when he noticed a "pink" or "reddish"-colored SUV drive by.  He only briefly saw the SUV, thought it was unusual to see a vehicle behind the restaurant at that time, and did not see where it went.  Shortly thereafter, he heard footsteps and, when he turned around, two men armed with pistols approached him.  Both were wearing baseball hats, and he thought they both had hoodies (sweatshirts) on and pantyhose over their faces.

4

As the robbers directed D.M. into the rear of the restaurant, one told him to get down on the ground, but then the other robber told him to get up. The robbers then directed D.M. to call for the other employee in the restaurant, which D.M. did. One of the robbers again directed D.M. to the ground, where he stayed throughout the robbery. The robbers were fully clothed and wore gloves, but D.M. could tell beneath the pantyhose that both were African-American. The second of the two robbers held D.M. on the ground at gunpoint while the first robber went to the front of the restaurant to the cash register where the other employee was counting the cash.

C.J., now an 18-year-old college student, testified that as she was counting cash at the register a robber brandishing a "shiny silver-type gun" approached her and directed her to the ground. The Government contends this robber is Bonner. C.J. described this robber as wearing "some sort of black cloth" over his face. She could make out an outline of a face that was an African-American male, but she could not make out "any other certain details" and was not asked to, and did not, describe this robber any further. This robber directed C.J. to open the safe under the counter, stating that if she did not do so he would kill her. He then started counting down from ten to one, pointing the gun at her. The robber got the cash and left abruptly, leaving C.J. lying on the floor. The robber took

5

approximately $500, and both robbers left through the rear door of the building.

The whole robbery lasted only one to one and one-half minutes. Once the robbers left, D.M. locked the back door and C.J. locked the front door and called 911. D.M. then observed in front of the restaurant the same burgundy SUV he previously saw at the rear of the restaurant, which at this time he recognized as a Honda Passport.

Deputy Eads of the Davidson County Sheriff's Department ("DCSD"), who was nearby, received the dispatch and arrived at the scene within approximately five minutes. He immediately spotted a burgundy SUV, which had been described to him on the dispatch, and stopped it. The driver was identified as Terry Bethea ("Bethea").[1] A search of the vehicle revealed a number of items, including some marijuana, Bonner's wallet and three cell phones later identified to be those of Bethea, Bonner's girlfriend - Tyra Edmonds ("Edmonds"), and Bonner's cousin - Lamont Ruth ("Ruth"). Several rounds of .357 ammunition were also found in the glove box.

Detective Stephanie Murphy of the DCSD arrived at the scene and retrieved and reviewed a security video that recorded the robbery. Portions of the video (without audio) were played for

---

[1] Bethea did not testify and, according to the Government, has not been charged in connection with this robbery. He was charged with possession of marijuana that evening but was released.

the jury. The video shows two robbers entering the rear of the restaurant and one robber, whom the Government contends is Bonner, approach C.J. at the cash register, conduct the robbery, and leave. As to this person, the video displays the robber's general height and size, keeping in mind he was wearing a dark bulky jacket and the video was shot from a raised angle near the ceiling. He can be seen wearing a black and white New York Yankees baseball hat. Detective Murphy separately brought C.J. and D.M. outside to see Bethea, but at least by the time of trial, both agreed that he did not resemble either of the two robbers. As C.J. put it, Bethea was not as "bulky" and did not have "broad shoulders" like the robber she observed. Neither C.J. nor D.M. identified any facial characteristics, height or other distinguishing feature of either of the robbers, and none was discernible on the video.

As law enforcement officers continued to process the scene that evening, they found a black and white New York Yankees baseball hat near the trash dumpster located not far from the back door outside the Subway restaurant. Detective Murphy testified that the hat was not present the first time officers checked behind the restaurant but appeared during the investigation. The hat was introduced into evidence, and C.J. testified that it appeared to be the hat worn by the person who

7

robbed her.  In addition, the jury was able to compare the hat to the one resembling it on the video.

Detective Corey Mann of the DCSD determined that the car driven by Bethea was registered to Edmonds.  Detective Mann obtained telephone records for Edmonds's and Ruth's cell phones found in the car, as well as for the pay phone at a Marathon Gas Station located approximately one quarter mile from the scene of the robbery.  The cell phone records show that at 11:12:15 p.m., 11:58:03 p.m., and 12:22:31 a.m. following the robbery, three calls were made from Bonner's cell phone to Edmonds's cell phone.  The records also reveal that five calls were placed from Bonner's cell phone to Ruth's cell phone at 12:07:35 a.m., 12:21:33 a.m., 12:27:10 a.m., 12:27:54 a.m., and 12:47:17 a.m. Finally, the records reveal a telephone call from the Marathon Gas Station pay phone to Edmonds's home telephone at 3:34 a.m. lasting approximately three and a half minutes.

Law enforcement officers attempted to track the robbers with dogs.  An initial dog search was unsuccessful.  Officer Dale Robertson of the North Carolina Department of Corrections was called to the scene and, at about 12:30 or 1:00 a.m. following the robbery, started tracking the robbers with his bloodhound, Rocky, based on a scent from the New York Yankees baseball hat.  Officer Robertson testified that the scent his dog tracked arose from gases produced as a result of skin

8

particles the wearer deposited on the hat as they interact with bacteria that breaks them down. Everyone's scent, he testified, is individual, like a fingerprint.

Officer Robertson noted that his bloodhound, Rocky, would pick up the "strongest scent" on the hat, which was likely the scent of the person who most recently wore it. Rocky tracked the scent for approximately 30 to 40 minutes, ending at a grassy area near a pay phone at the Marathon Gas Station shortly after 1:00 a.m. Officer Robertson left the Marathon Gas Station after Rocky lost the scent there.

Karen Winningham, a forensic biologist and special agent with the North Carolina State Bureau of Investigation, testified as to DNA analysis she performed on the New York Yankees baseball hat.[2] Agent Winningham testified that the DNA found on the baseball hat "is consistent with the mixture" of two or more people who contributed to the DNA profile. She received cheek swabs from Bonner in July 2009 and compared it to the DNA found on the baseball hat. She opined that the "predominant" profile of the DNA on the baseball hat matched Bonner's DNA profile. She further opined that the probability that the match was based on chance was one in greater than one trillion people. On cross-examination, she conceded that she could not testify as to who last wore the hat, including who wore it on the night of the

---

[2] Bonner stipulated to Agent Winningham's qualifications as an expert.

robbery. She also did not determine who else may have contributed DNA to the hat.

The Government put on evidence that the Subway restaurant purchased and sold goods that traveled in interstate commerce. Further, the Government presented testimony that the handguns viewed on the videotape appeared real and, in specific, that the handgun held by the robber wearing the New York Yankees baseball hat was a large caliber revolver. Finally, the Government presented evidence that the bullets removed from the vehicle driven by Bethea were .357 caliber ammunition, which fit a revolver.

C.

Bonner contends that the Government's evidence is insufficient from which a jury could reasonably conclude beyond a reasonable doubt that he committed the crimes charged. He contends that neither the presence of his wallet (which contained his driver's license) in the SUV nor the New York Yankees baseball hat with his DNA are sufficient to identify him as having been present at the scene of the robbery. He further points out that neither C.J. nor D.M. identified him as the robber. As to the New York Yankees baseball hat, Bonner argues there is no demonstration that he was the last person to wear it, and thus at best the Government has simply "convicted the hat," and not him. He notes that the Government failed to

10

indicate the content of the telephone calls, which may have had "innocent and useful purposes." (Doc. 35 at 10.) (Bonner's defense theory is that he was trying to help Edmonds locate her SUV that went missing.) He further contends that the telephone call from the Marathon Gas Station pay phone to Edmonds's home was approximately 2 hours *after* the canine tracked to it, giving it limited significance. In substance, Bonner argues that the Government seeks to impermissibly stack inference upon inference in its effort to identify him as one of the robbers.

The Government's theory of the case is that Bethea dropped off Bonner and an accomplice at the back of the restaurant for the robbery. After Bonner and his accomplice completed the robbery, they exited the rear of the restaurant. The Government contends that the robbers and Bethea confused their getaway plan and that Bethea mistakenly thought he was to pick up the robbers in front of the restaurant. Things went awry when Bethea was not present to pick up the robbers, who then had to scramble to locate Bethea. About that time, the Government contends, Detective Eads arrived and detained Bethea and the SUV he was driving, thus causing Bonner and his accomplice to flee the scene to avoid being detected by law enforcement. It is at about this time, the Government argues, that Bonner lost his New York Yankees baseball hat behind the restaurant as he fled. The Government argues that Bonner fled to the nearby Marathon Gas

11

Station where he attempted to call Edmonds to pick him up, but he had to wait for the canine handler to leave the area. The Government also contends that, in attempting to secure a ride to safety, Bonner tried to reach Edmonds and his cousin, Ruth, on their cell phones shortly after the robbery.[3]

In viewing all the evidence in the light most favorable to the Government, the court finds that, while a close case, the evidence is insufficient to support a reasonable jury's verdict beyond a reasonable doubt that Bonner was one of the robbers of the Subway on October 29, 2008. The Government points to Bonner's wallet found in Edmonds's SUV driven by Bethea, Bonner's DNA on a New York Yankees hat apparently used during the robbery and found at the scene, testimony that a bloodhound tracked the scent from the hat to a pay phone from which a call was placed to Edmonds's house after the robbery, and the cell phone call logs. The Government correctly notes that circumstantial evidence is sufficient to convict a defendant,

---

[3] The Government also argues that evidence admitted in Bonner's defense supports the verdict. First, the Government argues that Bonner's alibi, based on Edmonds's testimony that he was home with her from approximately 9:00 p.m. until 5:30 a.m. the night of the robbery, is faulty insofar as she admitted to falling asleep and waking up to find Bonner outside arguing with Bethea. Second, the Government argues that Edmonds admitted on cross-examination that Bonner did not always leave his wallet in her vehicle, providing additional significance to the fact that his wallet and driver's license were found in the SUV on the night of the robbery. Because these arguments rely on evidence introduced after the Government rested its case, the court need not consider them in light of its ruling.

12

and eyewitness identification is not required. See United States v. Warren, 593 F.3d 540, 547 (7th Cir. 2010). However, the circumstantial evidence here contains an important but fatal gap.

The fact that the burgundy SUV was owned by Bonner's girlfriend and his wallet was found in the SUV certainly is some evidence to support Bonner's presence.[4] So is the New York Yankees hat containing Bonner's DNA as the "predominant" type. The DNA demonstrates that a hat previously worn – perhaps predominantly - by Bonner was present, not that Bonner was the person actually wearing it during the robbery.

The problem on this record is the lack of evidence that Bonner was the person who actually wore the hat on the night of the robbery. No eyewitness identified the robber the Government claims was Bonner in any respect, by facial feature, height, or any other feature, other than that he was an African-American male. Indeed, though C.J. precluded Bethea as a suspect because he was not as "bulky" or "broad shouldered" as the robber, indicating that she observed the robber sufficient to make such

---

[4] The Government contends that Edmonds loaned the SUV to Bonner the evening of the robbery. This is a very important piece of evidence. However, it was first introduced in *Bonner's* case-in-chief, not in the Government's case. The Government also points to evidence that Bonner in turn loaned the car to Bethea "mere hours before the robbery occurred." (Doc. 36 at 7.) The Government appears to have forgotten, however, that this was evidence the court excluded on hearsay grounds.

13

an identification, no attempt was made to identify Bonner (or his cousin Ruth) as fitting either of these characteristics.

Rather, Officer Robertson testified that his bloodhound, Rocky, followed the "strongest" scent found on the hat, which he stated was the scent of "the most recent person who used the hat." While Special Agent Winningham testified that the hat's predominate DNA belonged to Bonner, there was no testimony that the scent of the most recent wearer is, can be, or most probably was that of the predominate DNA. On this record, the most recent scent could easily be that of one of the others whose DNA Special Agent Winningham also testified was found on the hat. Special Agent Winningham conceded that her DNA analysis could not indicate who most recently wore the hat. The Government's case therefore rests on a jury's ability to draw the inference that the predominate DNA found on the hat provided the strongest scent on the hat. This is an inference unsupported by the testimony of any expert, and for a jury to draw such an inference would be speculative on this record.

The Government's evidence as to the cell phone and pay phone calls does not fill the gap.[5] Assuming that Bonner was the

---

[5] The Government introduced Bonner's cell phone records, which show numerous calls between Bonner, Ruth and Bethea the day before and day of the robbery. (Government Exhibit 17.) However, they show no outgoing calls from Bonner between 12:47:17 a.m. and 5:38:35 a.m. Bonner's phone records also show two "routed calls" at 2:48:48 a.m. and 2:52:59 a.m., though no testimony was presented as to what that means.

14

individual who made the calls from his cell phone, the fact that he was calling Bethea and Edmonds does not demonstrate that he was present at the time of the robbery.[6]  Even assuming that a jury could reasonably infer from the evidence that Bonner's cell phone battery went dead after the robbery and before 3:34 a.m., the Government's contention that Bonner was the one who placed the call from the pay phone depends on there being a sufficient link between the DNA evidence and the scent that the canine tracked to that pay phone, which is lacking.  As such, the pay phone evidence cannot supply the missing link for the DNA/canine evidence.

Cases where a defendant's conviction rests on circumstantial evidence generally involve some identity evidence that was not present in this case, such as the following:  the defendant was found in possession of the stolen money, Warren, 593 F.3d at 547; eyewitnesses gave a description of the perpetrator that matched the defendant, even though he disguised his face with black mesh and wore a hooded sweatshirt, United States v. Tilmon, 19 F.3d 1221, 1229-31 (7th Cir. 1994) (including weight of 175-80 pounds, height of 5'9" or 5'10",

---

[6]  Indeed, there is some inconsistency between the Government's contention that Bonner would use his cell phone to call Edmonds and Ruth but potentially expose himself to law enforcement to use a pay phone at the Marathon Gas Station to call Edmonds some three hours later.  However, the court recognizes that the Government is entitled to every reasonable inference that would explain this inconsistency (such as that the cell phone battery lost power).

15

that the robber was "in his mid-20's," drove a unique custom-painted car seen at the bank, and wore distinctive clothing required by his job); the defendant's handwriting was found on a demand note, United States v. Kittrell, 269 F. App'x 338, 342 (4th Cir. 2008) (noting that a bank teller also testified that the robber was "an older black man, with gray hair, a receding hairline, and facial hair" who she identified at trial as the defendant, and finding that the failure of DNA evidence on clothing attributed to the defendant to exclude others was not fatal given the other identity evidence), cert. denied, 129 S. Ct. 170 (2008); fingerprints matching the defendant were found at the scene of the crime, id.; Hammer v. Bowlen, 934 F. Supp. 911, 915 (M.D. Tenn. 1996) (noting that "[s]everal witnesses [also] gave physical descriptions of the two men which, apparently, the jury felt matched the physical makeup of the defendants"); the crime involved the use of special skills, such as making false documents and sabotage devices, possessed by the defendant, United States v. Kwong, 14 F.3d 189, 194 (2d Cir. 1994); the defendant was seen at the crime scene just before the robbery, Brown v. O'Brien, 624 F. Supp. 2d 136, 146-47 (D. Mass. 2009) (noting that the defendant was also aware of the weekly bingo jackpot and identified himself (shortly before) to another by the same first name as the robber, was identified as wearing clothing that fit the description of the clothing observed on

16

the robber, and was described as matching the physical appearance of the robber by height, weight and hair); or the defendant had a suspicious influx of cash after the robbery with which he made purchases, United States v. Morales-Machuca, 546 F.3d 13, 21 (1st Cir. 2008) (noting as well testimony that the defendant had stated that he had "scored a hit," and another individual took the defendant to a specific mile-marker to retrieve a pistol that was traced by ballistics both to casings found on the floor of a nearby abandoned vehicle used in the crime as well as to a bullet that struck a security officer injured during the crime).

Finally, the Government relies upon United States v. Kittrell, 269 F. App'x 338, and Cooper v. Berghuis, No. 1:06-cv-42, 2009 WL 537510 (W.D. Mich. March 3, 2009), for the proposition that DNA found on one piece of clothing at the scene of a crime is sufficient to identify a defendant as a perpetrator. In Kittrell, an unreported decision, the Fourth Circuit held that the evidence was sufficient to convict the defendant not only based on the defendant's DNA found on the clothing used in the robbery, but also based upon witnesses' in-court identifications of the defendant, a handwriting expert's testimony that the defendant likely wrote the demand note presented at the robbery, and the defendant's fingerprints found on the demand note. 269 F. App'x at 342. Similarly, in

17

Berghuis, no eyewitness could positively identify the defendant as the perpetrator, who wore a mask. On habeas review, the court upheld a state court conviction based not only on the defendant's DNA found on clothing used in the robbery, but also on multiple eyewitness descriptions that matched the defendant by height, build and hair (noting the robber was 5'7" tall, "kind of wiry" or "pretty scrawny looking," had a receding hairline (seen through the mask) which was "darkish, black-ish, gray color") as well as testimony that the clothing used by the robber was owned by the great niece of the defendant's girlfriend. 2009 WL 537510, *5-6. Thus, while these cases make clear that DNA evidence need not identify a defendant to the exclusion of all others, they each involve some evidence of identification beyond DNA evidence on clothing to support a conviction.

Here, the court finds the other admitted evidence, when considered with the DNA evidence, insufficient to support Bonner's guilt beyond a reasonable doubt as to Counts I and II in this case. The Government argues that, absent a confession, it could not obtain a conviction in any robbery that is perpetrated by individuals who are smart enough to mask themselves unless circumstantial evidence similar to that in this case is deemed sufficient. (Doc. 36 at 11.) The cases noted above, however, demonstrate that this is not the case.

18

To be sure, circumstantial evidence can provide substantial evidence to convict. Even evidence that, considered individually, is not strong can, when considered collectively, rise to the level of substantial evidence. Here, however, the court finds that the evidence supporting identity, while perhaps meeting the preponderance test, fails to rise to the level that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of Bonner's guilt beyond a reasonable doubt. Consequently, Bonner's motion for judgment of acquittal must be granted.

## II.

For the foregoing reasons,

IT IS THEREFORE ORDERED that Defendant's motion for judgment of acquittal made at the close of the Government's case be GRANTED and that this case be DISMISSED. A Judgment dismissing the indictment will be entered contemporaneously with this Order.

/s/ Thomas D. Schroeder
United States District Judge

June 16, 2010